LoriNG-, J.,
delivered tbe opinion of tbe court:
In tbis case tbe court find tbe facts to be—
That on tbe 17tb day of November, 1863, Anthony Reybold, one of tbe petitioners, was tbe owner of tbe steam vessel called tbe Express, of Delaware City, in tbe State of Delaware, and then in the employment of tbe United States.
Tliat on that day tbe said owner, by contract made witb Major Stewart Van Vleit, quartermaster in tbe service of tbe United States, and for that purpose duly authorized, chartered said vessel to tbe United States upon tbe terms in said contract or charter-party duly and fully stated, which charter-party is fully set forth in tbe claimant’s petition.
That on tbe 6th day of January, 1865, and while said vessel was in tbe employment of tbe United States under said charter-party, tbe said Anthony Reybold.sold to George F. Needham and Asa Needham, two of tbe petitioners herein, each one-quarter of said vessel.
That on the 20th of January, 1865, tbe said vessel was in the service of the United States under said charter-party, was tight, staunch, strong, and well and sufficiently manned, victualed, tackled, apparaled and ballasted, and furnished in every respect fit for the said service, and was lying in safety at a wharf in .the port of Washington, in the District of Columbia. And for protection against ice was sheathed with iron in her forward part twelve inches and elsewhere six inches above her waterline when loaded. And this is as high as such vessels are usually ironed, and the iron was in good order.
That on tbe 20th and 21st days of January, 1865, the Potomac River was frozen over from bank to bank at Washington, and the ice, from six to eight inches thick, extended on tbe shores about forty miles down tbe river; tbe channel only was kept open by tbe current and the passage of vessels, but masses of ice six or eight inches thick were floating in the channel,1 the weather was wet and cold, and ice was making. And in consequence of tbis condition of tbe river its navigation was suspended, except by government steamers and the ferry-boats between Washington and Alexandria.
That on tbe 20th day of January, 1865, and before that, Captain E. ,T. Allen, assistant quartermaster of volunteers, was in command of tbe army transportation on the Potomac, and bad his *282 office at the Sixth street wharf in Washington, in view of the river and. about sixty yards from it, and the condition of the river was visible and known to him.
That on the said 20th day of January, 1865, Captain Allen, acting in discharge of his official duty, issued to the master in command of said steamer Express the following order:
“ Sir : Having received on board seventy-five men, to-mor-morrow morning proceed to Giesboro; report to Captain L. L. Moore, assistant quartermaster,- receive on board eighty horses; proceed to City Point; report to Colonel G. W. Bradley, quartermaster j land the men and horses; return to this city and report to me, unless otherwise ordered.’’
And the said order was then neccessa.ry and required for the military service of the United States.
Previous to giving said order said Quartermaster Allen was, in answer to his inquiries, informed that the Express was sheathed Avith iron, and was of capacity to take the men, horses, &c., to City Point, by the captain of the Express, who made no objection to the order because, as he testified, he considered it imperative as a military order and as such obeyed it, though if he had considered he could have used his judgment he would not have left the wharf, as he did not consider it safe.
That on the 21st day of January, in obedience to said order, the master of the Express was proceeding with said steamer down the river with the men, horses, &c., on board, and when about twenty-eight or thirty miles down the river, opposite Gly-mont and just above Indian Head, her hull was cut or crushed in by heavy cakes of floating ice, twenty-five or thirty feet abaft her wheel on the starboard side and in her bows, and she filled and sank in about three and half fathoms of water in two or three hours after she began to leak. And the injury and sinking of the Express were without any fault on the part of her officers and crew, who navigated the boat with due skill and care.
That before the Express sank the steamer City Point and a propeller, General Bucker, came to her relief and succeeded in taking off the men and horses with Avhich she was loaded, and her officers and crew.
That the side-wheel steamer City Point and two propellers, the General Bucker and "W. Millden, all in the military service of the United States, started down the river from Alexandria that day. The Millden, an iron propeller, turned back, from *283 wbat cause was not shown. The City Point and General Rucker went through. On the day following the steamer Thomas Jefferson went up the river, and on her arrival at Alexandria was leaking badly, but it was not shown what caused her to leak.
That the Express was necessarily abandoned where she sank and remained in the water, subject to the action of the elements, about six weeks, and during that time drifted several miles down the river. As soon as the weather permitted she rvas raised by Avreckers employed by the petitioners, and towed into Baltimore and repaired.
That the necessary and reasonable expenses paid by the owners for raising said steamer, towing her into Baltimore, and repairing her Avere as folioavs, viz: For raising and toAving the steamer into Baltimore, $15,000 ; for repairs, $27,923 43— amounting altogether to the sum of $42, 923 43. And after deducting therefrom one-third of said cost of said repairs, viz., $9, 307 81, for new for old, the said claimants would be entitled to recover the balance of $39, 615 99, if they were entitled to recoA’er anything.
That the petitioners Imve at all times borne true allegiance to the government of the United States, and they haAm not nor has either of them in any way voluntarily aided, abetted, or given encouragement to the rebellion against said government.
The proximate cause of the loss was the ice in the Potomac River, Avhich Avas a marine risk. This is admitted, but it was contended that the steamer was sent doAvn the river in a time of danger from the state of the Aveather, by a military order which left her captain no discretion, but imposed on him implicit obedience, and that thus her loss Avas consequent on the act of the United States.
The loss of the steamer was certainly under a military order, and all her service was to be, as a necessary consequence of the contract in the case. That was made Avith the Quartermaster’s Department of the army in time of Avar and for its purposes, and therefore necessarily subject to its exigencies. That these would increase the marine risks to which the vessel might be exposed was certain Avhen the contract Avas made, and this must have been contemplated by the parties and shaped the terms of their contract, and that is to be construed in reference *284 to its circumstances; and then the term umarine rislcs” means necessarily the marine risks incident to the service in which she was to be employed, and that was military service in time of war, involving necessarily military exigencies and orders; submission to these, therefore, was the thing contracted for by the owners and for which they were paid.
Had this steamer been sent to Key West and wrecked in that dangerous navigation, it would have been under a military order, but it would have been a marine risk incident to her service; so here floating ice in northern rivers was a marine risk incident to her service, and her owners had specially prepared her for it by sheathing her with iron as armor against the ice, and the exigency that sent her down the river in bad weather was in the same way incident to her service and covered by the contract as much as any other part of her service.
The counsel for the petitioner cited the case of Williams v. The New England Insurance Company, decided in the circuit court of the United States in the district of Massachusetts, May, 1869. But that was on a policy of insurance between the owners and insurers, and the facts were that after she was insured the owners chartered her to the War Department to be used in the transport service. While carrying ordnance stores she was ordered across the bar of Hatteras Inlet, where there was not water enough for her draught, and lost.
It was held that the insurers were not liable, but the grounds of the defense and of the decision were that she was chartered after she was insured, and that her employment in the military service was a change of the risk contemplated, so that her loss was not by the perils insured against, but by the act of her owners wrongful against the insurers and under the contract.
But this charter-party places the vessel in the military service of the United States, subject to its incidents and the marine risks created by them, and these the owners expressly agreed to bear.
And we find as conclusions of law:
1. That the peril by which the steamer Express was damaged was within the term “marine risks” in the charter-party, and by the terms thereof was to be borne by the owners.
2. That the charter-party placed the steamer in the military service of the United States in time of war, and the term “ marine risks ” in the charter-party is to be construed in *285 reference to that service, and included risJcs from perils of the sea and seasons incident to that service and its exigencies.
That the steamer being by the charter-party in the military service was subject to military orders necessary for the proper performance of that service.
And on the facts stated it is found by the court that the defendants are entitled to judgment; that the petition should be dismissed; and it is so ordered.
Peck, J., dissented.